UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHELE R. GREEN,

          Plaintiff,

    v.

CAROLYN W. COLVIN,

          Defendant.

Case No.  13-cv-05105-WHO

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT, DENYING CROSS MOTION FOR SUMMARY JUDGMENT AND REMANDING FOR FURTHER PROCEEDINGS**

Re: Dkt. Nos. 13, 16

United States District Court
Northern District of California

Michele Green appeals the denial of her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI").  The administrative record includes medical documentation of Green's back pain and degenerative disc disease from 2010-2012.  Green's motion centers largely on step four of the disability determination; she alleges errors regarding the Administrative Law Judge's ("ALJ") weighing of medical evidence, credibility determination, and finding she had residual functional capacity ("RFC") to perform her past light work.  The ALJ rejected a substantial portion of the evidence, including the opinions of a treating nurse and physical therapists who concluded that Green was more limited in her functioning, as well as Green's personal testimony regarding the severity of her pain.  Instead, the ALJ relied on the unfavorable testimony of the examining medical consultant and an x-ray and MRI taken in 2010.

The ALJ's Decision used the wrong standard for weighing the testimony of the nurse practitioner, did not consider (because he did not have) the confirming opinion of the treating physician, misread the medical record, and inappropriately discredited the testimony of the plaintiff and her mother.  After carefully examining the parties' arguments, the ALJ's decision, and the record in its entirety, I find that the ALJ committed legal errors that warrant remand for

further proceedings.

**BACKGROUND**

**I.  PROCEDURAL HISTORY**

On February 9, 2011, plaintiff Michele Green applied for DIB and SSI under Titles II and XVI of the Social Security Act (sections 216(i), 223(d), and 1614(a)(3(A)), alleging an onset date of June 1, 2010.[1]  Administrative Record (Dkt. No. 11) 126, 134 ("AR").  Her applications were denied initially on April 27, 2011, and again on reconsideration on October 5, 2011.  AR 67-70, 78.

Green requested a hearing, and appeared before ALJ Richard Laverdure on June 12, 2012.  AR 23.  In an opinion dated June 25, 2012, the ALJ made the following determinations: (i) Green met the insured status requirements of the Social Security Act through December 31, 2011; (ii) there is no evidence of substantial gainful activity since June 1, 2010, the alleged onset date, that would preclude a finding of disability; (iii) Green has the severe medical impairment of degenerative disc disease of the thoracic spine, which causes more than minimal functional limitations in her ability to perform basic work activities; (iv) Green's migraine headaches are non-severe because the record does not contain a diagnosis from a medical source, the symptoms appear to have diminished, and treatment was limited to Tylenol; (v) Green does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR §§ 404.1520(d), 404.1526, 416.920(d), 416.925, and 416.926; (vi) Green has an RFC to perform the full range of light work as defined on a function-by-function basis in 20 CFR §§ 404.1567(b), 416.967(b); (vii) Green is capable of performing her past work; and (viii) Green was not under a disability between June 1, 2010 and June 25, 2012 under either Title II or Title XVI.  AR 14-18.

Green requested a review by the Appeals Council and submitted for the first time a signed endorsement from her treating physician of a physical capacity questionnaire that her treating

---

[1] While the summaries of application at AR 126 and 134 state that plaintiff's disability started on January 28, 2011, and that she applied for insurance on February 10, 2011, the ALJ decision, AR 12, and the parties' briefs refer to plaintiff's claim onset of disability as June 2010.

nurse had originally signed and submitted.  AR 1-5.  The Appeals Council determined the new

evidence did not warrant a review of Green's record and denied her request for review on

September 4, 2013.  AR 1-5.

**II.  FACTUAL BACKGROUND**

Green was born October 23, 1977 in Portland, Oregon.  She has been a single parent to her

three children since a divorce in 2009.  AR 218.  In April 2012, she and her children moved into

housing designated for people with disabilities in Alameda, California.  AR 313.

**A.  Medical Evidence**

The record includes Green's medical history from 2010-2012.  Many of the documents are

from Axis Community Health, where Green received primary care since March 2010.  AR 341.  In

September 2010, Green went to the emergency room at the Valley Care Medical Plaza for

abdominal and back pain.  AR 244-49.  The examination report stated her gait, abdomen, posture,

and weight bearing were "normal."  AR 246.  She had full range of motion of all extremities, her

joints were without pain, and she had no apparent hernias.  *Id.*

Green had an x-ray in October 2010, which showed "mild degenerative disc disease in the

mid-thoracic spine."  AR 271.  On December 3, 2010, Green reported nausea and rated her back

pain as "ten out of ten" during an appointment at Axis Community Health.  AR 262.  Green had an

MRI on December 28, 2010, which showed "disc desiccation and disc height loss, compatible

with degenerative disc disease."  AR 267.  The MRI showed multiple Schmorl's nodes from

Green's T5 to T10.  AR 267.  There was also a "small amount of endplate edema" at the

Schmorl's node by the endplate of T9, which the MRI report indicated could cause the condition

to be "acute" and "painful."  AR 267-68.  Additionally, at T7, the MRI showed a 12 mm

intraosseous lesion with characteristics compatible with an intraosseous hemangioma.  AR 267.

The MRI indicated "no significant posterior disc bulge to cause central spinal canal or neural

foraminal narrowing."  AR 267.

In January 2011, Green again visited Axis Community Health, complaining that Vicodin

was not relieving her pain and she was concerned about taking pain medication while responsible

for three children.  AR 260.  On February 3, 2011, Green visited Dr. Don Endress at the Don

United States District Court
Northern District of California

1    Pedro Family Practice for an intake exam, and he noted Green's history of degenerative disc

2    disease ("DDD").  AR 254.  He also noted his discussion with Green about her use of Vicodin and

3    Naprosyn for chronic pain, that she had been "dismissed from practive [sic] of over use of these

4    meds," and that he had refilled her Vicodin prescription.  AR 254.  The exam notes from that visit

5    indicate that Green's head, ears, eyes, nose, throat, neck, lungs, back, heart, abdomen, and upper

6    and lower extremities were "[within normal limits] for patient."  AR 254.  On February 21, Green

7    returned for a follow up exam, from which Endress' notes again indicate Green's history of DDD.

8    AR 253.  The exam record included Green's lab work, which showed abnormal Vitamin D levels,

9    for which Endress advised Green to take Vitamin D and calcium medication.  AR 253.  The exam

10   report shows Green's head, ears, eyes, nose, throat, neck, lungs, back, heart, abdomen, and upper

11   and lower extremities were "[within normal limits] for patient."  AR 254.  Green returned to Axis

12   Community Health in March 2011, with complaints of neck and pelvic pain.  AR 259.

13        Green alleges she fell from a ladder and was in two car accidents in June and August 2011,

14   and that these events aggravated the pain in her neck, shoulders, and back.  AR 209, 218, 194.  In

15   her appeal she explained, "I began experiencing the same pain with my right shoulder that I had

16   with my left that had prompted me seeking medical attention to begin with.  The pain in my neck,

17   shoulder, and back can be very intense.  My right knee and ankle are now also causing me a great

18   deal of pain and discomfort as well.  Additionally, I have been getting frequent Charlie horses in

19   my right calf."  AR 194.  In the fall and winter of 2011, she was prescribed Percocet, Flexeril, and

20   Norco.  AR 258, 318, 321-22.

21        An examining, but not treating, orthopedic consultant, Dr. Fariba Vesali, completed a

22   comprehensive orthopedic evaluation of Green on September 15, 2011.  AR 291-94.  According to

23   Vesali, Green reported during the exam that she had pain from her neck to her lower back but that

24   she drove, cooked, swept, mopped, vacuumed, and did grocery shopping, dishes, and laundry.

25   AR 291.  Vesali noted Green's diagnosis with DDD and chronic back pain.  AR 293.  He also

26   observed that rotation of her trunk exacerbated her pain, Green's cervical, thoracic, and

27   lumbosacral spine was tender, and he expected condition would continue for at least twelve

28   months.  AR 293-94.  Additionally, Vesali noted that Green was "not in acute distress" and had

4

United States District Court
Northern District of California

full motion of her lumbar and cervical spine.  AR 292-93.  She had a negative straight leg raise when seated and supine.  AR 293. Overall, Vesali found Green could walk, stand, and sit for six hours in an eight hour work day with normal breaks, and she could lift and carry fifty pounds occasionally and twenty-five pounds frequently.  AR 294.  Vesali concluded she was capable of the full range of medium work.  AR 294.

On October 5, 2011, the SSA state agency medical examiner reviewed Vesali's report and affirmed that Green's impairment was "non severe."  AR 302-04.  The examiner found that Green was "partially credible as to [the] allegations however not to [the] severity."  AR 303.  The medical examiner noted that while Green complained of worsening symptoms, she had not yet started physical therapy nor consulted with a pain management doctor.  AR 303.

Green completed eight sessions of physical therapy March 12-April 5, 2012, with physical therapists Stephanie Kalivoda and Kevin Takao.  AR 344-351.  At Green's initial exam, Takao noted Green "presented with significant thickness right and left paraspinals (right more than left), middle trapezius and right levitator [sic] scapulae resulting in discomfort and limitation with functional activities . . . . decreased upper back strength and poor posture.  Patient will benefit from physical therapy."  AR 345.  Subsequent appointment records indicate that physical therapy had promising results: Green reported feeling less pain and discomfort, AR 346, "feeling much better," AR 349, and "no discomfort with any work-related or every-day activities."  AR 350.  She has said that her physical therapist gave her advice on how to lift and hold her children, which helped mitigate her pain.  AR 38.  When she reported discomfort in her neck and back, she also said she had been lifting and carrying heavy boxes as part of a move to a new house.  AR 347-51.

Kalivoda and Takao completed a Social Security physical impairment questionnaire on June 6, 2012, ahead of Green's hearing with the ALJ.  AR 343.  They stated Green was capable of lifting twenty pounds occasionally and ten pounds frequently; of standing and walking for three to four hours in an eight-hour workday; and of sitting for a cumulative six hours in an eight day workday.  AR 343.  They reported Green needed a break from standing and walking after less than two hours, and she could sit for one to two hours before needing to change position.  *Id.*  In response to the question about the effect of Green's pain on her ability to concentrate, Kalivoda

5

and Takao answered that discomfort results in frequent position changes.  *Id.*  The questionnaire concludes that her prognosis is good.  *Id.*

Stasia Tell, a certified family nurse practitioner at Axis Community Health who treated Green between 2010 and 2012, completed the same Social Security physical impairment questionnaire on May 10, 2012.  AR 341.  This questionnaire indicated that Green had greater capacity in some areas than the physical therapists determined.  Tell concluded that Green was capable of lifting twenty to fifty pounds occasionally and twenty pounds frequently; of standing and walking four hours in an eight hour workday; of needing a break from standing and walking after two hours.  AR 341.  In other areas, Tell determined that Green was less capable than the physical therapists had found, concluding that Green was capable of sitting for less than two hours in an eight day workday, while needing to stand, lie down, or take a break after less than two hours.  AR 341.  In response to the question about the effect of Green's pain on her ability to concentrate, Tell reported that Green's performance in school declined from the honor roll to a 2.8 grade point average as a result of the pain associated with sitting for long periods of time.  AR 341.  Like the physical therapists, Tell concluded Green's prognosis was good.  AR 341.  On July 20, 2012, prior to plaintiff's request for review by the Appeals Council, Dr. Charles White endorsed and signed the questionnaire Tell had completed.  AR 232, 354.  White is Tell's supervising physician.  AR 232.

In addition to her back, neck, and shoulder pain, Green has various other medical complaints.  In late October 2011, she began experiencing severe pelvic pain, for which she underwent hernia surgery on November 28, 2011.  AR 84.  She also complained of migraines that occur approximately once a month.[2]  AR 33-34.

**B.  ALJ Hearing**

At the June ALJ hearing, Green testified that her typical level of pain was seven out of ten, and that she experienced ten out of ten-level pain "at least once a month, three or more days."  AR 29.  She said there were days she would like not to get out of bed because of her pain, but that

---

[2] There is also evidence Green was diagnosed with endometriosis, but she did not assert it as a basis for her disability claim.  AR 17, 40, 242.

United States District Court
Northern District of California

1    she did because of her children, school, and work.  AR 29.

2         When asked about her pain medication, Green testified that it caused serious side effects,

3    including fatigue and difficulty focusing her attention.  AR 31-32.  Green testified she has "an

4    aversion to medication," so usually she "tries not to take anything."  AR 31-32.  Green stated she

5    was taking Norco and Robaxin at the time of the hearing, but that she had only taken two Norco

6    pills over the course of the most recent semester.  AR 31, 32.  Green also complained of

7    migraines, and said it was "a very easy choice" to choose to take Tylenol to treat a migraine in lieu

8    of Norco to treat her back pain.[3]  AR 35.

9         Green testified her normal activities include childcare, laundry, grocery shopping, driving,

10   walking, cleaning dishes, and sweeping or mopping, and that she must take frequent breaks due to

11   her pain.  AR 38, 165, 291.  In particular, she said driving, dishes, and laundry make her pain

12   worse.  AR 29.  She testified she felt "very uncomfortable the entire time" she was doing those

13   activities and has difficulty completing the tasks in one attempt.  AR 29, 38.  She said, "I feel like

14   I always have dirty dishes because I can't ever stand there and finish them all," and she leaves

15   clean laundry in her car after returning from the Laundromat.  AR 30.  Green testified that her

16   physical therapist advised her not lift her children due to her condition, but that she thought that

17   was "impossible."  AR 37.  Doing activities like lifting her children, however, did cause her

18   "muscles to go into spasm" on occasion, her back to feel like "a bowl of jello," and "really weak

19   and tired."  AR 38.

20        Green's mother, Debbie Paladino, also testified to Green's marginal performance of basic

21   tasks.  AR 42-43; Mot. 19.  Green and her children moved in with her mother in La Grange,

22   California approximately two and a half years before the hearing and stayed for approximately a

23   year and a half.  AR 42.  Her mother said Green "was in pain a lot."  AR 42.  Green "tried to do

24   what she could, but it was hard on her . . . . she never, like, tried to get out of doing things.  She

25   just worked through the pain."  AR 42.  Paladino commented, "I think standing, like washing

26   dishes, was, like about one of the worst things."  AR 42.  For many activities, Green "would have

27

28   [3] According to an Axis Community Health medications record from March 2011, Green had an
     allergy to Tylenol.  AR 258.

United States District Court
Northern District of California

United States District Court
Northern District of California

to take breaks." AR 43.  Paladino said Green could not sit and focus on one task for even two hours.  AR 43.

Green discussed her attendance at Los Positas College in Livermore, California, where she has been studying since 2008.  AR 35.  She testified that a full-time schedule was 12 units.  AR 36.  The semester before her hearing, she registered for 15 credits but dropped to 10, and the semester before that, she took 12 credits.  AR 36.  Some of her courses were online, which allowed her to work from home at her own pace.  AR 36-37.  Since November 2011, she had also held a work-study job as an office assistant at Los Positas, where she worked twenty hours per week and earned $800 a month.  AR 33.  Her responsibilities included seated computer work or errands around the campus.  AR 33.  Her employer allowed her to miss a day of work if her symptoms unexpectedly required it, as well as to change her hours and take breaks more frequently than was customary. AR 33.

A vocational expert testified that based on her reported job history, Green has relevant light work experience between 2004-2007 as an administrative clerk, cashier, fast food worker, and assistant ranger.[4]  AR 44-46, 187-192.

### C. ALJ Decision

The ALJ found the report from Vesali, the consulting examiner, was "consistent with the preponderance of the medical evidence of record as a whole" and gave it great weight.  AR 17.  In addition, the ALJ pointed to the "overwhelmingly benign" x-ray and "normal" MRI, the "benign results" from physical examinations, and the lack of medical evidence that contradicted Vesali after his exam.  AR 17.  However, "out of an abundance of caution" and viewing the medial evidence in the light most favorable to the claimant, the ALJ lowered Green's RFC from medium work, as Vesali suggested, to the full range of light work.  AR 17.

The ALJ accorded less weight to the physical impairment questionnaires submitted by the physical therapists and Green's treating nurse at Axis Community Health.  The ALJ reasoned that

---

[4] Green's most recent substantial gainful employment was in merchandising, which she left in 2007 when she became pregnant.  AR 291.  Green explained, "I am worried that going back into merchandising (my former line of employment) would greatly aggravate my condition as I have been told to not even lift or carry my children much less boxes, displays, ect. [sic]"  AR 198.

United States District Court
Northern District of California

the physical therapists "only treated the claimant for 8 sessions over a span of only about three weeks, and their suggested RFC was incongruous with the x-ray, MRI, and physical exam reports." AR 17. The ALJ found that Tell's RFC assessment was also "too restrictive" because it was "inconsistent with the overwhelming medical evidence of record," including the MRI, x-ray, and physical exams. AR 17. Additionally, the ALJ also said that Green's daily activities, including school, work, and childcare were "entirely inconsistent" with the physical therapists' and Tell's assessments of disability. AR 17.

The ALJ found Green's testimony and allegations were "not generally credible," including her complaints about medications causing fatigue and impaired focus. AR 17. The ALJ noted Green had maintained an "active" lifestyle, which undermined her testimony about feeling pain. AR 17. Her treatment had consisted only of pain medication and physical therapy. Finally, the ALJ noted that Green lifted heavy objects during her March 2012 move and had an ongoing custody dispute, both of which could be alternative causes of declining performance in school and contradictions to her alleged incapacity to work. AR 18. The ALJ also discounted her declining grades as evidence of pain and suggested her poor performance was more likely to be due to overwork and stress related to a custody dispute rather than pain. AR 17.

## LEGAL STANDARD

## I. DISABILITY DETERMINATION

A claimant is "disabled" as defined by the Social Security Act if: (1) she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the impairment is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 1382c(a)(3)(A)-(B); *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012).

To determine whether a claimant is disabled, an ALJ engages in a five-step sequential analysis. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v). In the first two steps, the claimant must establish

9

that she (1) is not performing substantial gainful activity, and (2) is under a "severe" impairment. 20 C.F.R. §§ 404.1520(a)(4)(i)-(ii).  An impairment must have lasted or be expected to last 12 months in order to be considered severe.  20 C.F.R. § 416.909.  In the third step, the claimant must establish that his or her impairment meets or medically equals a listed impairment described in the administrative regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant's impairment does not meet or equal one of the listed impairments, before proceeding to the fourth step, the ALJ must make an RFC determination based on all the evidence in the record; this determination is used to evaluate the claimant's work capacity for steps four and five.  20 C.F.R. § 404.1520(e).  In step four, the claimant must establish that his or her impairment prevents the claimant from performing relevant work he or she did in the past.  20 C.F.R. § 404.1520(a)(4)(iv).  Once the claimant has established this prima facie case, the burden shifts to the Commissioner to show at the fifth step that the claimant is able to do other work, and that there are a significant number of jobs in the national economy that the claimant can do.  20 C.F.R. § 404.1520(a)(4)(v).

## II. STANDARD OF REVIEW

A district court reviews the ALJ's decision to determine whether the ALJ's findings are supported by substantial evidence and free of legal error.  42 U.S.C. § 405(g); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).  Substantial evidence means "'more than a mere scintilla,' but less than a preponderance." *Saelee v. Chater*, 94 F.3d 520, 521-22 (9th Cir. 1996) (internal quotations and citations omitted).  This "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotations and citations omitted).  A court must review the record as a whole and consider adverse as well as supporting evidence. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).  Where evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld. *Id.*

## DISCUSSION

At issue is the fourth step in the five-step inquiry into Green's alleged disability.  Green does not contest the ALJ's determinations under steps one, two, or three that (i) there was no evidence of substantial gainful activity that would disqualify Green; (ii) that her degenerative disc

United States District Court
Northern District of California

disease constitutes a "severe" impairment; or (iii) that her impairment was not medically equal to one of the listed impairments. What she disputes is the little weight given to her treating care providers and her own testimony and the substantial weight given to the Social Security consultant's exam. Green argues that this error caused the ALJ to improperly determine under step four that her RFC is the full range of light work, that she is capable of past light work, and, under step five, that there are jobs in the national economy that she could do.

## I. RFC DETERMINATION

### A. The Standard for Weighing Medical Evidence

Plaintiff argues that the ALJ erred in discounting the capacity determinations of Green's doctor, nurse, and physical therapists, while affording significant weight to the SSA consulting examiner.

To make a disability determination, the Commissioner considers the medical opinions on record and other relevant evidence. 20 C.F.R. § 404.1527. Medical opinions are "statements from physicians and psychologists or other acceptable medical sources," 20 C.F.R. § 404.1527(a)(2), that can be used to establish the claimant has a medically determinable impairment at step two. 20 C.F.R. § 404.1513(a). "Other sources" of evidence may also be used to show the severity of impairment. 20 C.F.R. § 404.1513(d). To reject the opinion of a medically acceptable source, the ALJ must give specific, legitimate reasons based on substantial evidence in the record. *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012). The ALJ may discount an "other source" opinion by giving reasons germane to that witness. *Id.*

The Social Security Act statute provides factors for evaluating opinion evidence in the record, such as whether the source had a treating relationship with the claimant, the duration and frequency of the treatment, and the nature of the treatment. 20 C.F.R. § 404.1527(c). The same factors used to weigh the opinion of a "medical source" may also be used to weigh "other medical sources." 20 C.F.R. § 404.1527(d)(3); Soc. Sec. Rul. 06-03p. Generally, more weight should be given to a treating medical source than an examining source because "[the treating source] is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989); *see also Lester v. Chater*, 81 F.3d 821,

United States District Court
Northern District of California

830 (9th Cir. 1995).  A treating physician's opinion is not necessarily "conclusive" regarding the claimant's physical condition or the determination of disability.  *Thomas v. Barnhart*, 278 F.3d 947, 956 (9th Cir. 2002) (internal quotations omitted).  The ALJ may reject the opinion of a treating medical source in favor of a conflicting opinion of an examining physician only if he or she "set[s] forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Magallanes*, 881 F.2d at 751. Similarly, the duration of treatment is a positive factor in the weight afforded to an opinion. 20 C.F.R. § 404.1527(c); *Benton v. Barnhart*, 331 F.3d 1030, 1038 (9th Cir. 2003).

The Commissioner gives no "special significance to the source of an opinion" (from either an "acceptable medical source" or "other source") in weighing the evidence to determine the claimant's RFC.  20 C.F.R. §§ 404.1527(d)(1)-(3). The importance of the distinction between "acceptable medical sources" and "other sources" is explained in a Social Security policy ruling as:

> "Information from these 'other sources' cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an "acceptable medical source" for this purpose. However, information from such "other sources" may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."

SSR 06-03p.  The weight given to an "other source" is fact specific, and when the Section 404.1527 factors for weighing opinion evidence are applied, an "other source" medical opinion "may outweigh the opinion of an acceptable medical source."  *Bidad v. Colvin*, 12-cv-6384-NJV, 2013 WL 4488695 (N.D. Cal. Aug. 20, 2013).

The question of whether a nurse practitioner is an "acceptable medical source" or an "other source" depends on the facts of a case and whether the nurse practitioner was working closely with a doctor.  In *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996), the Ninth Circuit held that a nurse practitioner working in conjunction with a physician constitutes an acceptable medical source, while a nurse practitioner working on his or her own does not (and therefore is an "other source"). In reaching its conclusion, the court in *Gomez* relied both on the fact that the nurse practitioner was the doctor's agent and also on 20 C.F.R. § 416.913(a)(6), which provided that "[a] report of

United States District Court
Northern District of California

1    an interdisciplinary team that contains the evaluation and signature of an acceptable medical

2    source is also considered acceptable medical evidence."  *Id.*   Section § 416.913(a)(6) was

3    repealed, but the Ninth Circuit in *Taylor v. Commissioner of Social Security Administration.*, 659

4    F.3d 1228, 1234 (9th Cir. 2011), confirmed that a nurse practitioner working in conjunction with a

5    physician could constitute an acceptable medical source, while a nurse practitioner working on his

6    or her own constitutes an "other source."  In *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir.

7    2012), the Ninth Circuit preserved the narrow exception allowing "other sources" like nurse

8    practitioners to be treated as acceptable medical sources when they work closely under the

9    supervision of a doctor.[5]

10       Physical therapists are generally treated as "other medical sources" under 20 C.F.R.

11   § 404.1513(d)(1).  *See, e.g., Bowser v. Commissioner*, 121 Fed.Appx. 231, 239 (9th Cir. 2005)

12   (holding that a physical therapist was an "other source" as defined under 20 C.F.R. § 1513(d));

13   *Banuelos v. Colvin*, 2-cv-01961-LHK, 2013 WL 5226116 (N.D. Cal. Sept. 17, 2013) (considering

14   a physical therapist's assessment as "non-medical evidence").

15       **B.  The Level of Significance the Commissioner Should Give Nurse Practitioner Tell's**
         **Opinion, After it was Affirmed by Doctor White.**

16

17       The first issue is whether Dr. White's endorsement of the Axis Community Health

18   questionnaire shows that Tell and White were working together so that the Tell opinion should

19   have been considered with the weight of a treating physician instead of as an "other medical

20   source."  The endorsement, even though it was obtained after the ALJ's Decision, establishes that

21   Tell's report should have been treated as an acceptable medical source.  The ALJ's use of the

22   wrong standard infected his entire review of this case.

23       District courts reviewing an ALJ decision should consider evidence that was submitted for

24   the first time to the Appeals Council.  *Taylor*, 659 F.3d at 1232; *Lingenfelter v. Astrue*, 504 F.3d

25   1028, 1030 n.2 (9th Cir.2007).  This evidence is "part of the administrative record, which the

26   district court must consider when determining whether the Commissioner's decision is supported

27   _____

28   [5] The court in *Molina* noted that the holding in *Gomez* may have been undermined by the repeal of
     20 C.F.R. § 416.913(a)(6), but did not "address *Gomez*'s continued vitality" because the other
     source in that case acted independent of any supervising physician.  *Molina*, 674 F.3d at 1111 n.3.

1   by substantial evidence." *Brewes v.Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1159-60 (9th Cir.

2   2012).

3       The Commissioner does not dispute Green's contention that Dr. White is her treating

4   physician or that Axis Community Health is where she received primary treatment. *See* Mot.

5   (Dkt. No. 13) 7; Opp'n (Dkt. No. 16) 6. The Commissioner presents several other arguments,

6   however, to justify discounting White's opinion. First, the Commissioner contends that because

7   White's endorsement was not introduced into the record until after the ALJ issued an unfavorable

8   decision, the ALJ could not have weighed it. Opp'n 9; AR 354. While that is true, I must

9   consider Dr. White's endorsement of the Tell opinion in my review of the evidence because it is

10  part of the administrative record. *Brewes*, 682 F.3d at 1159-60. As a treating physician for the

11  claimant, White's endorsement should be given special consideration unless it is rejected with

12  specific, legitimate reasons grounded in substantial evidence of the record. *Lester*, 81 F.3d at 830.

13      The Commissioner then asserts that White's endorsement in this review should receive

14  little weight because by securing the endorsement Green was simply seeking "out more favorable

15  evidence only after the ALJ denied her disability applications." Mot. 9 (citing *Weetman v.*

16  *Sullivan*, 877 F.2d 20, 22-23 (9th Cir. 1989) (holding that a doctor's opinion is all the less

17  persuasive since it was obtained by [the claimant] only after the ALJ issued an adverse

18  determination")). But as Green responds, it is her responsibility as the claimant to obtain and

19  submit medical evidence, 20 CFR § 404.1512(c). White's opinion is not less reliable because it

20  was submitted later. Reply (Dkt. No. 17) 3.

21      Next, the Commissioner argues White's endorsement of an opinion that was already in the

22  record did not "alter the substantial evidence supporting the ALJ's decision." Opp'n 10. The ALJ

23  is empowered to "disregard the treating physician's opinion whether or not that opinion is

24  contradicted" if the claimant does not furnish sufficient evidence of a disability. Opp'n 6 (citing

25  *Magallanes*, 881 F.2d at 751. The Commissioner contends that the ALJ gave "good reasons that

26  are supported by substantial evidence" to reject White's opinion, such as arguing that the

27  Tell/White opinion was "inconsistent" with the "normal" x-ray and MRI, "benign" physical

28  exams, and Green's "active" daily life. Opp'n 6-7; AR 17. But as I will discuss below, I disagree,

United States District Court
Northern District of California

14

and a central reason for my disagreement is that the ALJ failed to credit Tell's and White's opinion with sufficient deference.

Critically, White's endorsement establishes that Tell worked in conjunction with a treating physician.  The ALJ erred under *Taylor* for treating Tell's opinion as an "other source."  Throughout Green's medical records, Tell's name appears as the point of contact between Green and Axis Community Health.  Courts that have critiqued the *Taylor* exception for treating nurse practitioners as acceptable medical sources have cited difficulty in determining that the nurse worked in conjunction with a treating physician.  *See, e.g. Hernandez v. Colvin*, No. 13-cv-2525, 2014 WL 1800408, at *8 (C.D. Cal. May 6, 2014) (finding that no evidence supports Plaintiff's contention that [the supervising physician] also signed off on the residual functional capacity assessment.").  In this case, however, Dr. White did just that—he signed off on the same opinion.  AR 354.  Therefore, the narrow exception for nurse practitioners working closely with a treating physician applies in this case and warrants treating Tell's opinion as an acceptable medical source.

### C. Alleged ALJ Error In Finding The Tell/White Opinions Contradicted An "Overwhelmingly Benign" Record.

The Commissioner argues that the ALJ properly discounted Tell's opinion because it was "too restrictive" in that it contradicted both the acceptable medical evidence and Green's "reported ability" to attend college, raise her children, and work part-time.  Opp'n 8; AR 17.  To support the argument that Tell's opinion contradicted Green's lifestyle, the Commissioner cites to *Rollins v. Massanari*, in which a doctor's assessment of a claimant's disability was properly discounted because it was inconsistent with the claimant raising her children without help from her former husband.  261 F.3d 853, 856 (9th Cir. 2001).  Similarly, the ALJ argues that Tell's assessment that Green could sit no more than two hours in an eight hour workday was inconsistent with other evidence, such as a September 2010 treatment record that Green was in no apparent distress and had a normal range of motion and weight bearing, AR 245-46, as well as a February 2011 medical progress report that references Green's DDD but, the Commissioner argues, "not[es] no objective tests or findings."  Opp'n 10; AR 255.  Additionally, the Commissioner contends Tell's

1   assessment was inconsistent with the physical therapists' finding that Green could sit for six hours

2   in an eight-hour workday.  Opp'n 10; AR 343.

3       Green disputes the argument that the Tell opinion contradicts the record; she contends Tell

4   was "consistent with every treating source in the record."  Mot. 8; Reply 4.  Green points to her

5   history of pain medication prescriptions and two years of treatment records that include

6   observations such as "constant" pain, a "left shoulder painful range of motion," and "left trapezical

7   shift visible almost like webb neck."  Mot. 8; Reply 4-5; AR 245; 255-266; 315-332.  Green also

8   argues that the physical therapists' assessment that Green could sit for less than two hours before

9   needing a break or change of position corroborated Tell's opinion that Green can sit for less than

10   two hours and stand or walk for only four hours in an eight hour workday, and confirmed that she

11   could not work an eight-hour work day.  Mot. 7; AR 242, 343.

12       Additionally, Green asserts that Tell's opinion was consistent with the MRI because it

13   showed disc desiccation, disc height loss, and endplate edema "which can be painful" and led to

14   her diagnosis of DDD.  Mot. 11; Reply 5.  She argues that the ALJ was himself inconsistent in

15   arguing both that the MRI was "overwhelmingly benign" and that Green's "medically

16   determinable impairment could reasonably be expected to cause some alleged symptoms."  Mot.

17   11; AR 16.  "Tellingly," Green contends, the ALJ mitigated Vesali's assessment to find Green was

18   capable of light as opposed to moderate work.  Reply 5.

19       Moreover, Green asserts, the ALJ should have given Tell's opinion more weight than

20   Vesali's because it met Section 404.1527 factors for affording more weight to certain kinds of

21   evidence.  The treating relationship and duration of contact Tell had with Green notably exceeded

22   the interaction Green had with Vesali.  Reply 6; § 404.1527(c); *Lester*, 81 F.3d at 830 ("more

23   weight should be given to the opinion of a treating source than to the opinion of doctors who do

24   not treat the claimant"); *Benton*, 331 F.3d at 1038.  Unlike Vesali, who only examined Green

25   once, Tell developed a "longitudinal knowledge" of Green's impairment between 2010 and 2012.

26   Mot. 6; AR 314-339.  Similarly, the Tell opinion should have been given substantial weight

27   because the treatment provided at Axis Community Health directly addressed the functional

28   capacity of Green's back.  20 C.F.R. §§ 404.1527(d)(2)-(3).

United States District Court
Northern District of California

16

I find that the ALJ erred in concluding that Tell's opinion contradicted the record and also that the ALJ's characterization of the physical exam records as "benign" is misleading. Green complained of pain at every visit and was prescribed serious prescription pain medication. While the MRI and x-ray showed Green was in "normal range" on several general factors, they also indicated degenerative disc disease, disc height loss, and the potentially painful buildup of edema. AR 268. As such, it was insufficient for the ALJ to point to them as "contradictory" to the treating opinions that Green was suffering from severe pain that limited her physical capacity. In the same line of reasoning, it was also in error for the ALJ to give Vesali's exam the most weight on the grounds that his findings were consistent with the "generally normal" MRI.

**D.  Alleged Error in Weight Given to Physical Therapists**

The Commissioner makes a parallel argument to justify the ALJ giving the physical therapists' opinion little weight. First, the Commissioner argues that because physical therapists are "not an acceptable medical source," their opinion cannot be given "controlling weight," like a treating medical source. Opp'n 7. In addition, the Commissioner argues that the physical therapists' opinion should receive only little weight because it was inconsistent with the record and the physical therapists treated Green for a relatively short period. Opp'n 7 (citing *Benton*, 331 F.3d at 1038 (the duration of treatment is a positive factor in the weight afforded to an opinion)).

Green argues that "other source" opinions should be considered along with acceptable medical sources to determine the claimant's RFC, and so the ALJ should have given specific, legitimate reasons to discount the physical therapists' opinion. AR 234; 20 C.F.R. § 404.1527(d); SSR 06-03p. Regarding the duration of treatment, the physical therapists saw Green for eight sessions over three weeks, so their opinion deserves greater weight than Vesali's one-time exam. Mot. 10; Reply 4. Similarly, Green contends, the physical therapists' opinion should have been given substantial weight because the treatment they provided directly addressed the functional capacity in question: restoration of Green's ability to lift objects, sit, and stand. Mot. 10; 20 C.F.R. §§ 404.1527(d)(2)-(3).

To discount an "other source" opinion, such as a physical therapist, the ALJ need only give reasons germane to that witness, a lower standard than rejecting an acceptable medical source.

United States District Court
Northern District of California

1 Applying that lower standard, I find that the ALJ has given an insufficient reason in stating the

2 physical therapists' assessment was inconsistent with the record. The Commissioner's assertion is

3 unsupported that a "benign" MRI and x-ray undermined the physical therapists' opinion. The

4 proper weight to give to the physical therapists should be reassessed, taking into consideration the

5 Tell/White opinion as part of the medical record and that the physical therapists treated the

6 specific impairment at issue over several weeks.

7   **E. Alleged ALJ Error as to Green's Credibility**

8   Green argues that the ALJ erred in finding that Green's statements about the intensity,

9 persistence, and limiting effects of her symptoms were contradicted by the record and therefore

10 were not fully credible. See AR 16.

11   A claimant's subjective testimony, if credited, serves as evidence of inability to work. 20

12 C.F.R. § 404.1529(c)(4). The court determines the claimant's credibility through a two-step test.

13 First, the claimant must present objective medical evidence of an impairment that could

14 reasonably produce the symptom alleged. *Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1196

15 (9th Cir. 2003); *Smolen* 80 F.3d at 1281. The claimant "need not show that her impairment could

16 reasonably be expected to cause the severity of the symptom she has alleged." *Smolen*, 80 F.3d at

17 1282. The ALJ also "may not to discredit excess pain testimony solely on the ground that it is not

18 fully corroborated by objective medical findings." *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir.

19 1989) (internal quotations and citations omitted). Similarly, the Ninth Circuit has made explicit

20 that ALJs must "be especially cautious in concluding that daily activities are inconsistent with

21 testimony about pain, because impairments that would unquestionably preclude work and all the

22 pressures of a workplace environment will often be consistent with doing more than merely

23 resting in bed all day." *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014).

24   Once the claimant has met the first step and there is no evidence of malingering, the ALJ

25 only may reject the claimant's testimony about the severity of her symptoms with clear and

26 convincing reasons. *Smolen*, 80 F.3d at 1281. "The clear and convincing standard is the most

27 demanding required in Social Security cases." *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d

28 920, 924 (9th Cir. 2002). The ALJ must identify with specificity what testimony is not credible

United States District Court
Northern District of California

18

1    and what evidence undermines the claimant's complaints."  *Lester*, 81 F.3d at 834.

2         The Commissioner asserts that the combination of Green's work, school, and daily

3    activities constitute clear and convincing evidence that Green was more functional than she

4    claimed to be.  Opp'n 13 (citing to *Bray v. Astrue*, 554 F.3d 1219, 1227 (9th Cir. 2009) ("the ALJ

5    may weigh inconsistencies between the claimant's testimony and his or her conduct, daily

6    activities, and work record")).  In particular, the Commissioner disputes whether Green received

7    "special accommodations" at her work-study job within the meaning of the SSA, and suggests that

8    even her "efforts to work" undermine her credibility.  Opp'n 13 n.3.  Similarly, the Commissioner

9    maintains that the ALJ reasonably attributed Green's marginal performance at school to stress and

10   a custody dispute rather than her alleged disability.  Opp'n 14; AR 17-18.

11        The ALJ further found that Green's performance of chores, childcare, and lifting heavy

12   boxes during her 2012 move undermined her testimony of disabling pain.  Opp'n 12, 14.  The

13   Commissioner cites to *Rollins*, in which the court held, "the claimants claim to have totally

14   disabling pain was undermined by her own testimony about her daily activities, such as attending

15   to the needs of her two young children, cooking, housekeeping, laundry, shopping, attending

16   therapy, and various other meetings every week."  261 F.3d at 857; *see also Thomas* 278 F.3d at

17   958-59 (holding that a claimant's ability "to perform various household chores such as cooking,

18   laundry, washing dishes, and shopping," suggested the ability to perform reduced light work);

19   *Fair v. Bowen*, 885 F.2d at 603 (holding that "[if] a claimant is able to perform household chores

20   and other activities that involve many of the same physical tasks as a particular type of job, it

21   would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the

22   claimant from working.").  The Commissioner also maintains that it was permissible to consider

23   that Green left her prior employment in 2007 in order to raise children, not because of disabling

24   pain.  Opp'n 13.

25        Finally, the Commissioner places significant weight on the fact that at the time of the

26   hearing, Green had received only "conservative" treatment of pain medications and physical

27   therapy.  Opp'n 13.  The Commissioner cites to *Tommasetti v. Astrue* and *Parra v. Astrue* as

28   authority that "conservative treatment is sufficient to discount a claimant's testimony regarding

United States District Court
Northern District of California

19

severity of an impairment." *See Tommasetti* 533 F.3d 1035, 1039 (9th Cir. 2008); *Parra*, 481 F.3d 742, 750-51 (9th Cir. 2007).

In response, Green contends that as a threshold matter her testimony should not have been discounted because it was consistent with the evidence on record:  the MRI results objectively noted her condition could be painful; doctors have provided treatment and powerful pain medication, including Norco; her treating doctor, nurse, and physical therapists all noted limitations consistent with her testimony of pain; and her mother testified as a witness to her pain and fatigue.  Mot. 14; AR 42-43, 256-266, 320, 322, 343, 354.

Moreover, Green argues the ALJ failed to give clear and convincing reasons to reject her credibility.  She argues he was required to do so because she met the *Batson* threshold test of establishing an impairment that could cause pain through the MRI's indication of a buildup of edema.  Reply 7; AR 16, 268; *Batson*, 359 F.3d at 1196.  Green concedes that her work, school, and daily tasks "may involve work-like activities," but she argues that the difficulty and extended time and accommodations she required to do these activities weighs in her favor, not against.  Reply 7.  Claimants need not be "utterly incapacitated to be eligible for benefits," *Fair*, 885 F.2d at 603, and "should not be penalized for attempting to lead normal lives."  *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

Regarding her schoolwork, Green contends the ALJ failed to provide clear and convincing evidence that her declining performance was unrelated to her medical condition.  The record includes substantial documentation of her back pain while mild anxiety—a factor relied upon by the ALJ in discounting her credibility—only appears in June 2011, which was more than one year after her grades began to decline and she received three Fs in the Spring 2010 semester.  Mot. 17; Reply 8; AR 228, 327.  Second, Green argues the ALJ erred in putting emphasis on her course load—which the ALJ noted was full or almost full time—instead of her marginal performance. Mot. 17-18; Reply 7.  Green argues the ALJ should have noted that she failed to perform the majority of her coursework, took some courses online so she could work from home at a slower pace, and stood during classes to relieve her pain.  AR 32; Mot. 18.

Regarding her work-study, Green says the office provided a "sheltered work environment"

in which she was given special treatment due to her condition to switch tasks, take a day off, or take breaks as needed, which was more frequently than customarily allowed.  AR 32-33; Mot. 16. She contends this fits the factors of special conditions under Section 404.1573, which states that work done under special conditions may lead to a determination the claimant does not have the ability to do substantial gainful activity.  20 C.F.R. § 404.1573.  Green further contends the ALJ did not cite to substantial evidence that these accommodations do not constitute special conditions. Reply 8.  Also, as she worked only twenty hours per week, the job did not qualify as substantial gainful employment and so is not significantly inconsistent with her testimony regarding her symptoms.  Mot. 16.  Green adds that her decision to leave her job in 2007 due to pregnancy does not contradict the possibility that she became disabled in 2010, and so the ALJ's consideration of this was off point.  Reply 9.

Regarding daily housework and childcare, Green argues that her "marginal performance of these activities," such as leaving dirty dishes in the sink and clean laundry in the car, "demonstrates that she is not successfully accomplishing them."  Mot. 19; Reply 9; AR 28-29. The Ninth Circuit has held that the transferability of activities done at home to a workplace should be considered in a credibility determination, and that "home activities are not easily transferable to the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication."  *Fair*, 885 F.2d at 603.  Green argues that her marginal performance of home activities, with frequent breaks to rest, indicates a non-transferable capability.  Mot. 15.  The ALJ merely stating that she does these activities is not sufficient clear and convincing evidence. Reply 9.

Regarding her lifting boxes in 2012 specifically, Green notes there is no evidence in the record that the boxes were heavier than twenty pounds, which the physical therapists and treating physician have said she can lift occasionally.  Mot. 20.  This activity therefore is not inconsistent with the other treating sources.  Moreover, this one-time event does not necessarily demonstrate that her capability is transferable to a day-to-day work responsibility.  Mot. 20.

I find that there is some evidence in the record that might suggest Green's capacity is greater than she attested:  she took her pain medication at less than the prescribed dose, her

physical therapy prognosis for recovery was "good," and Green said the therapy made her "feel[] much better," and "feel better for a little bit."  AR 29, 349.  The record is also not clear that her declining academic achievement was directly attributable to her back pain.  The drop in her grades began in the Spring 2010 semester, and she does not allege a disability onset date until June 2010. *See* Mot. 17.

However, the lack of objective medical evidence is not grounds for dismissing a claimant's assertion of excess pain, such as Green's testimony that she was "uncomfortable the entire time," and that, as a single parent, the work consisted of activities that she "ha[d] to do."  AR 29.  As she testified, "[t]here are days I'd like to not get out of bed because of my pain, but I have children, and, and school, and work."  *Id.*  Such symptoms that cause poor performance in activities like school can be preventative of "maintaining even a sedentary full-time job." *Smolen*, at 1292. Also, the conservative treatment in *Tommassetti* and *Parra* is distinguishable from Green's treatment. In this case, medication has not "controlled" the problem, as in *Tommassetti*, but potentially exacerbated it by impeding her ability to focus.  The claimant in *Parra* had received as treatment only over-the-counter medications, and not prescription medication like Green.  Her physical therapy may have provided some relief, but she was still testifying to experiencing significant pain at the time of treatment and at the hearing.

For similar reasons, the testimony of Green's mother should not have been discredited. The ALJ's argument that sources who "simply repeat already discredited statements are not entitled weight either" fails where the claimant has not been found non-credible with clear and convincing evidence. *See* Opp'n 12.

## F.   Alleged ALJ Error in Determining Green's Residual Functional Capacity Was Light Work.

If the ALJ finds a claimant's impairments do not meet or equal a listing, it must determine whether the claimant has the RFC to perform the requirements of her past relevant work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  Under the statute, an RFC to do "light work" includes "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and can also include "a good deal of walking or standing, or seated "pushing and pulling

United States District Court
Northern District of California

1   of arm or leg controls."  20 C.F.R. § 404.1567(b).

2       The Commissioner maintains it did not err in declining to incorporate the opinion of the

3   treating sources and the claimant because both were properly discounted.  Opp'n 15.  The

4   Commissioner contends that because it did not err in determining Green was capable of light

5   work, it was therefore proper to determine Green could perform previous light work.  Opp'n 15.

6       For the same reasons as discussed above, Green argues that if Vesali's opinion were given less

7   weight and more weight were given to the treating doctor, nurse, and physical therapists, the ALJ

8   should have found Green did not have the RCF to do even sedentary work on a sustained basis.

9   Mot. 21; Reply 5.

10      The ALJ is in error where the residual functional capacity determination "improperly

11  discounted significant evidence in the record favorable to [the claimant's] position," as I have

12  already found occurred.  *Taylor*, 659 F.3d at 1233.

13  **II.    REMAND IS WARRANTED**

14      Green argues that this case should be remanded for payment of benefits, but the

15  Commissioner argues that remand for further proceedings is required if I determine that the ALJ

16  erred.

17      "Remand for further administrative proceedings is appropriate if enhancement of the

18  record would be useful."  *Benecke v. Barnhart*, 379 F.3d 587 (9th Cir. 2004); *Harman v. Apfel*,

19  211 F.3d 1172, 1178 (9th Cir. 2000).  A court should remand a case to the agency to which

20  statutes give primary responsibility for the determination.  *INS v. Ventura*, 537 U.S. 12, 16 (2002).

21      A court should make a determination of disability and remand for payment of benefits

22  According to the credit-as-true rule when (i) the ALJ failed to provide legally sufficient reasons

23  for rejecting the evidence; (ii) there are no outstanding issues that must be resolved before a

24  determination of disability can be made; and (iii) the record is clear that the ALJ would be

25  required to find the claimant disabled were such evidence credited.  *Benecke*, 379 F.3d at 593;

26  *Harman*, 211 F.3d at 1178.  This rule allows courts "some flexibility" and may not be dispositive.

27  *Connett v. Harnhart*, 340 F.3d 871 (9th Cir. 2003).

28      The recent Ninth Circuit decision in *Garrison v. Colvin*, 759 F.3d 995, 1022 (9th Cir.

United States District Court
Northern District of California

23

2014) relied upon the credit-as-true rule as well as the *Connett* allowance for flexibility.  In

*Garrison*, the court remanded the case for benefits, concluding that the ALJ should not be allowed

to revisit medical opinions that were rejected for insufficient reasons where was no need to further

develop the record as to the claimant's disability.  *Id.*  Addressing the third component of the

three-part credit-as-true rule, the court found that there was no need for further proceedings

because a vocational expert has already testified that a person with the symptoms claimant and her

treating sources described would be unable to work.  *Id.*

        Here, the Commissioner argues that if the Court finds an error, it should remand to give the

SSA the opportunity to correct any errors identified by the court.  Opp'n 15.  The Commissioner

also urges the Court to reject Green's request that the case be reassigned on remand because there

is no allegation of bias.  Opp'n 18-19.  Green argues that the ALJ's determination was

unreasonable and that there are no outstanding issues to be resolved for a finding of disability.

Reply 10.  Green also contends that if the case is remanded, it should be reassigned to another

ALJ.  Mot. 23.

        Because Green does not satisfy all conditions of the credit-as-true rule, I find that this case

should be remanded for further proceedings. While the ALJ failed to provide legally sufficient

reasons for rejecting evidence, there are outstanding issues that must be resolved before a

determination of disability can be made.  Foremost, a rebalancing of the evidence that includes the

Tell/White assessment might show she is capable of less than sedentary work or sedentary work.

*See* AR 48.  There is no indication of bias that warrants reassignment to another judge.

United States District Court
Northern District of California

**CONCLUSION**

For the reasons cited above, I DENY the Commissioner's Motion, GRANT the plaintiff's motion, and REMAND the case to the SSA for further administrative proceedings.

**IT IS SO ORDERED**.

Dated: November 13, 2014

WILLIAM H. ORRICK
United States District Judge